All rise. Court is now in session. May be seated. The clerk will call the next case. After 17-04-19, the case is Estate of L.P. Murphy, a minor. Attached is Brenda Murphy of Towns by Jennifer Lynn versus Megan Murphy, Appalachian, by Tennis for Energy. First of all, I'd like to thank you for rearranging and being flexible so that we can accommodate another panel. And with that, you may proceed. May I please report to any host? My name is Joan Prudench. And I'm here with my associate for us on the NADA today. And we represent the appellates in this matter. Did you know you can approach the podium if you're more comfortable? Or if you're comfortable there, you can stay there. Well, I think you could use the podium. I think for recording purposes. Yeah. Thank you. I apologize. I told them it's been since 2002 since I've had the pleasure of coming down. Once every 15 years is good for the soul. It's good for the soul. Would you like me to restart just for recording purposes? Again, if it may please the court, my name is Jennifer Lynch. And I'm here with my associate today, Mr. Faras Avanada. And we represent the appellants in this matter, Mr. and Mrs. Patrick and Brenda Nowatzki. Mr. and Mrs. Nowatzki are the paternal grandparents of Abigail Murphy, who is 8 years old. Their son, Patrick Nowatzki, is her natural father. And I apologize if the briefs were a little bit confusing. Neither Patrick Nowatzki, the older or the younger, go by senior or junior. The appellee is Megan Murphy. She is the natural mother of Abigail. There are other parties also involved in this case, namely Megan's parents, Brian and Diane Murphy. And there is also mention of Megan's other child, Bailey, who is age 12. Her father is not the grandchild of my clients. Abigail is now 8? She is still 8. She will turn 9 later this month. There are, at least in initial matter, in terms of standard of review, there are questions we raise in our appeal, both on an abuse of discretion issue, as well as legal error and subject matter jurisdiction. We believe that there are issues on the timing of the petition, issues related to the court's treatment of fees and the error to include some language about the fees, and the issue of the court relying on written statements to the guardian ad litem. We believe all of those issues are subject to de novo review by this court. Additionally, we believe that the court made errors related to the review of the fees in general, as well as omission of testimony by the guardian ad litem, which would be subject to an abuse of discretion review. There are also two legal issues involved. The first is Supreme Court Rule 137. And for the purposes of the appeal, we had attempted to point out both on the trial court level and our appeal that Rule 137 is based on written pleadings, motions, and other documents. And it requires a signature to sign that with the best of his or her knowledge, information, and belief after a reasonable inquiry. And it be well-rounded in fact, warranted by existing law, not for improper purposes. And all of those issues become important as to what happened in the trial court. The other statute that becomes important in this matter in particular, is 755 ILCS 5-11, which governs guardianship of minors. And in particular, Section 11-5, which is the jurisdictional basis for a court to proceed in a guardianship. A court in a guardianship proceeding cannot proceed if there is a parent willing and able to make and carry out day-to-day child care decisions regarding a minor. So that being said, I wanted to review some of the initial facts of the case just so our argument makes a little bit better sense. In this situation, the mother, Megan Murphy, took some psychotropic medication,  and hospitalized on or about April 3rd of last year, 2016. On April 4th, the next day, her parents, Mr. and Mrs. Murphy, as well as my clients, Patrick and Brenda Nowatzki, went to probate court. And together, they filed identical petitions for guardianship. One for Abigail, and one for Bailey. May I interrupt you? Yes. This child has the last name Murphy? Correct. So has Patrick, not Junior, but younger Patrick, been determined to be the father? Yes. There was a politician, I don't have the case number. So there was a paternity action? Yes, there was an adjudication of paternity also in Will County. Okay. And that existed before? Before the filing of the guardianship, absolutely. Okay, thank you. You're welcome. That following Friday, Mr. and Mrs. Nowatzki learned that Megan Murphy may have been subject to discharge from the hospital. And they went late in the day, actually Patrick, on his own, went late in the day to the main courthouse and attempted to secure a petition for an order of protection. Who's on that petition? Patrick, the older. Okay. And actually Patrick, the younger, was with him though. But the petition was filed by Patrick, the elder, the grandfather. Grandpa Pat. Correct. And in that petition, there's some uncontroverted issues that happened on that day. One of them being is that Grandpa Pat did not actually write the petition. He was the assistant of the folks at the Will County Courthouse, but he didn't sign the petition. He later testified that he didn't really read the petition, and it became clear during the hearing on the motion for sanctions that he doesn't read particularly well. And that petition for order of protection was heard that day. And during the hearing, one of the issues that came up was on the petition itself. The petition cited that the natural mother, Megan, attempted to kill herself in front of the child, Abigail Murphy. And that is one issue that is part of the motion for sanctions. During that hearing, the judge specifically asked Patrick, the elder, Grandpa Pat, if that had occurred, and he had informed the court that no, that had not occurred this time. The court heard extensive testimony both by Grandpa Pat and the father, Pat, and ultimately granted that order of protection. The court in that situation said that he was entering the order based on the totality of the circumstances. At that time, Mr. Nowatzki had told the court that he didn't necessarily not want Megan to see her children, but was worried about her picking up the kids. He also informed the court that they had petitioned for guardianship, and the court noted that that case was up the following week in court. And so if we could fast forward to the following Wednesday, Mr. and Mrs. Nowatzki, Mr. and Mrs. Murphy, as well as the natural mother, Megan Murphy, all appeared in probate court. This time they were all still unrepresented by counsel, and they appeared in court and Judge Allen, who is the presiding trial court judge, appointed a guardian ad litem. The guardian ad litem proceeded to interview all of the parties. The parties all told Ms. Wengler, the guardian ad litem, that DCFS was completing an investigation, that Mom was in outpatient psychiatric treatment at that time, and that despite the order of protection, that Mom was in phone contact with Abigail. After interviewing everyone, Ms. Wengler told the court that she did not believe that the mother was ready, willing, and able to parent. The other very important issue that day is that Ms. Wengler had informed the court that there was something called a safety plan. And so the court believed that the Department of Children and Family Services had a written agreement with the parties about where the children were supposed to be. And that is also important because there was no written safety plan. And despite all of these parties, including the natural mother, all coming to court, intimating that there was some sort of agreement with DCFS, wasn't that not in fact the case? Two weeks after and at the conclusion of that hearing, the court did appoint Mr. and Mrs. Nowatzky as guardians without prejudice of Abigail and appointed Mr. and Mrs. Murphy as guardians without prejudice of Bailey. Two weeks later, Ms. Murphy did obtain counsel. Her attorney came to court, filed motions to vacate all of the guardianships and filed a motion to vacate the order of protection. The court heard the motion to vacate the order of protection that day, but before the court heard any testimony, an order was entered dismissing that order of protection. That was on April 22nd of last year, 2016. The next time it was up in court was on May 4th, about two weeks later. On that day, Mr. and Mrs. Murphy, Megan's parents, filed a cross petition for guardianship of Abigail. The court again extensively inquired as to the existence of the safety plan. The court, if you review the record, was most concerned about whether or not Ms. Wengler was able to get her hands on the safety plan from the Department of Children and Family Services. At that time, she had told the court she had yet to hear back from DCFS. The court, because of the lack of the written safety plan, did grant the guardianship of Abigail to Mr. and Mrs. Murphy. So approximately three and a half weeks later, Abigail went from the physical custody of Mr. and Mrs. Nowanski to the physical custody of her other grandparents, Megan's parents. That's where Bailey was. Correct. And so the idea of the court, and I think the court reflected very clearly, is the court wanted to keep those two children together. And so that proceeded. At that time, the natural father also appeared in court. He had reflected to the court that he wanted his own child. And the court had indicated to him that he should really hire an attorney. Just as I would note, during all of these petitions, whether the petitions filed by my client or the petitions filed by Mr. and Mrs. Murphy, all of the allegations were against mom and no allegations against the natural father. Do you think they're one of the petitions identified father? Because there's a blank on the petition for guardianship indicating whether the father is able to care or I don't know what the language is, but I know that Nowanski's petition for guardianship didn't mark the box indicating that father, anything about father. I know no one made a single allegation. I cannot even recall if they listed his name, any of the parties. Puzzle. I will tell you a week later, Mr. Nowanski, Patrick, the father, attorneys did file a motion also attacking the guardianship. It was back in court on May 16th. The judge, again, his primary inquiry was about the DCFS safety plan. Not about had there been a change in condition of the mother or anyone else. There's more concern about a DCFS safety plan. What is a DCFS safety plan? Sure, Judge. I could tell you because I do some work with CASA in Will County. A safety plan is a written document that the Department of Children and Family Services enters into with a natural parent or a guardian, whoever may have custody of a child, and that would be if they went out and they found a situation that they believed was concerning enough that they may need to take protective custody, but where the parents were willing to acknowledge there might be a problem, and there's a written agreement where someone else would have physical custody of the child and set for some restrictions on how the parents would have contact and those types of things. So in essence, it's an avoidance of that. Absolutely. Okay. So Judge Allen was looking for the safety plan that mother agreed to with DCFS. Correct. Did anybody indicate to Judge Allen that father had been contacted by DCFS? Judge, the only real mention of father was on the May 4th hearing, and then subsequently when he hired counsel about a week later, despite him having a close relationship with my parents as well. So it would probably be best to characterize that he was willing to allow his parents to carry the weight, so to speak, until he realized that maybe he needed to step up. Justice, as I could tell you, on May 24th, 2016, the court inquired again about that DCFS safety plan and for the first time really acknowledged the father before the court. And at that time, the court indicated that it still had some concerns about the natural mother, Megan Murphy, but had no information to suggest the father couldn't parent, therefore he did not have jurisdiction to proceed and vacated all of the guardianships. At that time, yes? Was Patrick father the father of Bailey, or did that decision result in splitting the girls up? The decision, he simply vacated the guardianships in finding that he had no jurisdiction to proceed on either guardianship. Was Bailey his father, Patrick? No. Okay. All right. Thank you. Judge, that being said, we did end up ultimately in a discussion on 137 fees. I would point out a couple things very quickly. The biggest concern we have, Justice, is that the order of protection was dismissed voluntarily on April 22nd, 14 days after his intern. Was the petition for fees filed in the OP case? No, it was filed in the P case. All right. The petition for fees was filed within what time frame of the guardianship? It was filed within 30 days of the guardianship being vacated, but 119 days after the final judgment on the OP. And that is our first issue that we take, is that the court essentially lumped the allegations in the OP together with the allegations in the probate case, rather than what we were arguing is that the court lacked jurisdiction to consider any conduct or any inaccuracies on the pleading in the order of protection because they were 119 days after final judgment. And we think that that was improper on its face. Judge, also the court was very clear in reflecting that its decision was based on misrepresentations to his guardian in line. We strongly suggest that Rule 137 is based on pleadings, not on misrepresentations to a guardian in line. And for the court to base its rulings on concern about misrepresentations to a guardian in line is not well placed regarding 137 sanctions. And what were those alleged misrepresentations made? In what action and when? They're alleged misrepresentations in both actions, Your Honor. In the order of protection, the alleged misrepresentation was that the mother attempted suicide in front of Abigail. Those are fine and well dandy, but the real issue legally is those misrepresentations in the OP you're saying should not be considered, because the OP should not be considered as a basis for sanctions. Correct, Your Honor. Right? Yes, that is our argument. Okay. And then your second action is there were, or the second stage of that is that we have a guardianship proceeding, correct? Correct. And that you're saying there were misrepresentations made to the GAL in those proceedings? Judge, the... Oral misrepresentations. The Movens had alleged, we defended the motion for sanctions. The Moven had suggested, and the court had, in its finding, said that he was basing his decision to award sanctions based on oral misrepresentations to the guardian in line. So we don't know which oral representations in what proceeding when? It is... Your position legally is you can't talk about the OP. The time has gone on. Correct. There's an allegation of misrepresentations in the guardianship proceeding. Right. There are... There are oral misrepresentations, and you're saying 137 sanctions only go to pleadings. Yes. And there are no misrepresentations in the pleadings? Judge, the alleged misrepresentation in the pleading was that Ms. Murphy was suicidal. Okay. And so that was the other... The motion for sanctions was based on the written alleged misrepresentation in the order of protection and on the written alleged misrepresentation in the petition for guardianship that she was suicidal. Okay. But your position is the first one is too late. Too late as to anything in the OP and improper as to anything in the OP. Yes. Okay. But now you're saying your defense is the guardianship is what? It's multifaceted. Okay. And the first part of our argument is that the court, in making its decision, was basing its decision on oral representations to the guardian enlightened made within that guardianship rather than on pleadings in the guardianship. Right. That's a matter of law. Right. You're saying that. Correct. And since he... He didn't make any written findings. Okay. Whatsoever. So it is... We have some oral pronouncements that the judge made, but because he didn't make any written findings, the oral pronouncement, in our minds, makes it appear as though he was making, basing his order on what may or may not have been said. Is it a violation to not make written findings? Is there a requirement? We believe there is a requirement under 137 to reduce that in the judgment itself or within the written order. Okay. So you're saying that's a repressibility? We do, Judge. What else do you have? We argue that the facts, in general, do not support the finding at all as an abuse of discretion, given the circumstances of this case. And, again, we have two sets of grandparents coming in together, both alleging that Ms. Murphy was suicidal, admitting that she's in outpatient psychiatric treatment. So it's a suggestion of pleading that she was suicidal, especially when her own parents, at the same time, are filing a pleading saying their daughter was suicidal. We believe that that was a reasonable basis for Mr. and Mrs. Nowoski to include that in their petition. So you're saying the judge, in a sense, that no reasonable person would do what the judge did? Yes, Your Honor. I don't see any other questions. Thank you. Thank you, Your Honor. Ms. Banerjee. May it please the Court, Counsel, Justices, my name is Shomesh Banerjee, and I represent the respondent slash appellee, Megan Murphy. Before I present my points, I just wanted to address a couple of issues that Ms. Lynch raised. With regard to the pleadings, there are two pleadings that we're talking about. One is the petition for the order of protection. The order of protection was voluntarily dismissed, but the actual petition was not ever dismissed or stricken or withdrawn. So the petition for the order of protection remained on the record and was extensively a part of the guardianship proceeding. In fact, the misrepresentation in the order of protection, stating that Megan, the mother, had attempted suicide in front of the minor, Abigail, was part of the reasoning that led the trial court to make, to appoint the Nowoskis as guardians for Abigail. You did file your petition for sanctions in the O.P. case. I'm sorry, Justice? You did not file your petition for sanctions in the O.P. case. We did not. The motion for sanctions was filed in the guardianship case, and the hearing was held on that. The hearing on the petition for the order of protection, didn't the petitioner make it clear, correct, when the judge went through the allegations? Didn't the petitioner correct and say, No, that's not from both children or one child. I mean, he corrected the inaccuracy in that he must have misunderstood the advocate that helped him put together the order of protection. Correct, Justice. In that particular hearing for the order of protection, he was asked by the judge, and he answered once in a rather convoluted manner. He was asked, Was Abigail present when Megan attempted suicide? And his response was, quote, This time, no. The day she did it, she had, Megan sent her to our house to spend the night. That was what he said. Later in the guardianship proceedings, he stated, as well as in the hearing, that he had stated several times that he was wrong in terms of stating that Megan was, or rather, writing in the pleading that Megan attempted suicide in the presence of Abigail. Our issue with that is that the pleading is a verified pleading, and there are 109 exits for a purpose. The pleading, he verified it. He said in that pleading, it was written, Megan attempted suicide in front of Megan, which he knew to be false because Abigail was actually in his house with him and his wife the day that Megan allegedly attempted suicide in front of Abigail. So you're saying, help me out here, that a verified pleading can't be corrected on record in front of the court? It can be, Justice. He attempted to correct it the one time. In the order of protection action? Yes, in the order of protection. In the petition for guardianship, there was no attempt at any point to amend the hearing, either in front of the court on the record or in front of the guardian ad litem. Megan contained the same allegations of the presence of the mother, or the presence of the child when the mother allegedly threatened suicide. Is that correct? In the petition for the order of protection, it stated that in the presence of the child, the mother attempted suicide. In the petition for guardianship, the allegation was that the mother has attempted suicide multiple times and has been hospitalized. Okay, so it's a different allegation. It is a different allegation. Okay, now why are you treating these as same actions? Because the petition for the order of protection was granted on the basis of the false allegation in the verified pleading in the petition. It was then brought into probate court because even though the petition for guardianship was filed first, the first order that was entered was in the order of protection. You're saying that even after this man corrects himself in front of the judge, the judge still relied on the misrepresentation in granting the order of protection? He corrected himself once, Justice, and as I said, it was in a fairly incoherent manner. He did not attempt to correct it later in that particular hearing, and neither was any attempt made by the petitioners in front of the probate court at the hearing for the appointment of the guardian as well as to the GAL. In fact, there were further false representations to the GAL to the extent that there was a safety plan in place, which there never was. There was PCFS involvement. There was an ongoing investigation which was later found to be unfounded in both children's cases. But there was no attempt in the guardianship case to correct the misrepresentation in the petition for the order of protection, which was part of the basis for which the trial court granted guardianship to the Nowanskis for Abigail. Well, I'm still trying to untangle this morass. You have an order of protection, a separately filed case. Correct. You have a petition prepared with some misstatements which were corrected orally in front of the judge, and an order of protection was granted. Correct. What happened subsequently to the order of protection? The order of protection was voluntarily dismissed by the parties in about 14 days. However, the petition remained on the record. The petition was not withdrawn. So what is the effect of that? When an order of protection is voluntarily withdrawn, you're saying the petition, something has to be done to the petition per se? It may not necessarily be required, Your Honor, but in this particular case since the petition was very much a part of the proceedings in the guardianship matter, the guardianship was granted to the Nowanskis thereafter the maternal. We know all that, but I'm trying to look at the legal effect of not having a petition withdrawn. You seem to think it's significant in a separate case that the order of protection itself has been voluntarily withdrawn. Why does that case not die? We believe it is, Your Honor, because those cases were consolidated at the beginning of the guardianship matter. At the hearing for the guardianship on April 13th, the cases were consolidated by the trial court. The order of protection had still not been dismissed. The guardian ad litem was given false representations orally. What is the purpose of the consolidation? Apparently under law, two purposes. What are you saying the purpose of this consolidation is for? Well, we believe just that the consolidation was for the, because the cases were, they were being treated as a single case, they became intertwined, and really one case could not be considered without the other.  That particular fact affected both the guardian ad litem's disposition as to what recommendations she would make regarding guardianship, as well as the trial court's decision regarding whether or not to appoint guardians for the child, based on the fact that the false representation in that petition, in the petition for the order of protection, was that the mother had attempted suicide. Is this the same judge? No, Justice. In front of, the order of protection was in front of Judge Mason, and the guardianship matter was in probate court in front of Judge Allen. However, he consolidated both matters because, as I said, the cases are intertwined. The parties remain the same. The issue was that the mother was now being, the mother now had an order of protection issued against her, based on that representation, that misrepresentation. At the time of consolidation? The cases were consolidated at the hearing for the petition for guardianship. At that time, the order of protection did exist against the mother. Did it prohibit her from having any physical contact with Abigail? She was prohibited from physical contact. She was not allowed to be within, I think, a hundred feet. Which meant Abigail's current guardian, her mother, couldn't, custodian, couldn't house her. Exactly, Your Honor. And, excuse me, Justice. And, in fact, the children, that was also part of the court's reasoning, as stated in the hearing, for sanctions, was that as a result of that, the children, who had been together all their lives, and were, I think, seven and, I think, perhaps five or six, I'm not exactly sure, at the younger child's age, were separated. They were in two separate homes, and that was, as the guardian ad litem stated, pursuant to a safety plan that had been initiated by the DCFS, which was also a misrepresentation. There was no safety plan in place. There was simply an ongoing DCFS investigation. So the children were separated. There was then a flood of litigation because the maternal grandparents then stepped in to petition for guardianship of Abigail, the child in question. The father stepped in. At one point, I think, five attorneys were involved in the matter. There was, obviously, a great amount of attorney's fees. The mother had to defend herself against both guardianship petitions, which were ultimately dismissed because the court found it did not have jurisdiction. And so the hearing for the motion for sanctions, in that particular hearing, the judge actually specifically stated that there were misrepresentations in two verified pleadings. As judges, we rely on these pleadings to be true. We make our own. Well, let's go back to that order of protection, Ms. Balderson. The verified pleading, you say you can't make corrections orally before the court. Is that correct? I did not say that, Justice. I said that he did make the correction only one time. He stated later. The same with the order of protection here. In the order of protection, when he went for the hearing, Mr. Glonsky. And it was brought before the court that that allegation in that verified pleading was inaccurate and an explanation was given before the judge. Yes. The judge entered an order of protection, correct? He entered an order of protection. And that was Judge Allen, correct? No, the order of. That was Mason. Correct. Okay. Now, then who consolidated it? Allen? Judge Allen consolidated it. Okay. And then did he have a transcript of that order of protection hearing? At the time of the hearing for the guardianship petition? No, he did not. No, at the time of consolidation. That was at the hearing for the guardianship petition. And he didn't. As far as based on the transcript, he did not have one. Everybody stepped up pro se. Judge Allen appointed a guardian adjutant, Ms. Wengler, who then proceeded to interview all the parties and came back and reported to the court that based upon that brief preliminary investigation, based on what all the parties were telling her about there being DCF's involvement, she believed there was a safety plan in place, there was an order of protection, the mother was currently undergoing treatment. She did not believe that there was a natural parent ready, willing, and able to parent at that time, and so she recommended guardianship. Judge Allen interviewed or asked extensively about the order of protection as well as the safety plan and then made his ruling appointing the Nowatzkis as the guardians. So there was the petition on the order of protection was verified and was corrected on the record in front of Judge Mason by Mr. Nowatzki, but as I stated previously, he made the one statement, even though he later said that he made several attempts. He did sign the pleading. He is expected to read the pleading before he signs it, and it was not simply a misunderstanding. It was an outright lie because the pleading states that she attempted suicide in front of Abigail and Abigail was actually in his and his wife's home at the time. So he corrected it. He said, no, not this time. She brought, Megan brought her to our house. So, you know, whatever the misunderstanding was, he corrected it. And then when there is a guardian ad litem appointed, it references that all parents, your clients' parents, the paternal grandparents, and dad and mom all met with the guardian ad litem and that she testified that all the parties told her that DCFS was completing an ongoing investigation and that the miners were placed. So if someone is out now lying, I guess it's everyone. Justice, if I may just correct that, if you look later in the transcripts and in the proceedings, the mother actually never stated that there was a safety plan in place. She simply stated that there was an ongoing DCFS investigation, which was the correct statement. The others stated that there was a safety plan in place. Certainly the Nowatzkis did. Now, perhaps they did not understand what a safety plan is. Yeah, that's why I asked for the record. I don't think people will understand what a safety plan is. And that's very possible, Justice. I am not saying that they have an understanding of the DCFS procedures, et cetera. Perhaps they thought that the fact that there was an ongoing DCFS investigation meant a DCFS safety plan. What is the importance of whether there is or is not a safety plan when the proceeding is before the court? What is the evidentiary importance of any of that? Well, if the DCFS states that or prepares a safety plan, then the children will be placed in accordance with that safety plan, which may include separating children from their parents and their siblings, as the case may be. Now, may I... Now, that's an administrative agreement. After investigation. And those administrative agreements don't hold much, do they? Well, in this case... Because we're asking the court now to make a proper placement with proper conditions for the safety of the child. Correct, Justice. And the DCFS can give all the evidence they want, or it can be represented that there is. But the question is, I'm asking, how important is this to a trial court? Well, Justice, I can speak from my own experience in probate court. If the GAL, the guardian ad litem who is appointed, believes that there is a safety plan in place, it requires considerable investigation or concerns from the, not necessarily investigations, but certainly concern on the part of the DCFS to propose that these children need to be placed in a certain manner, pursuant to what they believe is important. And the trial court, when considering something as significant as guardianship of children who have natural parents, will certainly consider the import of that and what the guardian ad litem recommends based on... Were there details presented as to what the safety plan was? In that particular hearing at the petition for guardianship, all that was stated was that there is a safety plan in place, but nobody really knows that the children are currently placed pursuant to a safety plan, but the GAL... So the trial court never inquired, nor was there any evidence presented as to the contents of the safety plan? The trial court did inquire, Justice, and... And what was the trial court shown? And the GAL said repeatedly that she had not been shown any paperwork. She had just been told. This was the very first time that the GAL was stepping up. This was the first hearing at that point. If the court feels that it is required, then the court will appoint a guardian ad litem who will make a preliminary discussion with the parent or the parties and then make a recommendation. That already happened. That was appointed. No, that was on that day. Judge Allen appointed Ms. Wengler as the guardian ad litem. She made a preliminary report based on her interviews with the parents and all the parties involved. And when she came back, she told Judge Allen that she had been told by all the parties that there was a pending DCFS investigation and also that there was a safety plan and that the children were placed pursuant to that. And given the fact that Megan was suicidal and not willing and able, she believed that she was not able and ready to parent even if she was willing. And therefore, her recommendation was that since there were two children who were in need of adult care, that a plenary guardianship be issued at that point of time with the Nowatzkis, who were the ones who were petitioning, be placed or appointed as plenary guardians of the children. Okay. And so we can't find out who did all the misrepresentation because it sounds like everybody did or didn't know what was going on, correct? Well, in the petition for protection, it's fairly clear that it was Mr. Nowatzki who made the misrepresentation that the child was in the presence of the mother when she attempted suicide. Didn't the trial court know, the one thing the trial court did know that was perhaps accurate, was that the mother was involved in a counseling program, a suicide counseling program, not an in-house but a day type of program? Yes, the guardian ad litem did present that information and the trial court was advised of that, which is why she stated that she did not believe that there was a parent at that time who was ready, willing, and able to parent the children, which is why she recommended the guardianship. So, in effect, Judge Allen, based on the information he had, that piece of information, which apparently was accurate, am I correct? Regarding the mother's treatment? The mother being treated? Yes, it was. Okay. Okay. Nowatzki made a placement with the Nowatzkis, right? The Nowatzkis, yes. And you're saying that that placement was only because of the allegations in the verified petition in the order of protection case? No, Justice, I'm not saying it was only because of that. I'm saying that it played a substantial role because based on that petition for the order of protection, an order of protection was, in fact, issued, and that order of protection was brought into the guardianship case, consolidated with the guardianship case at the beginning of the case, and affected the decisions or the recommendations of the guardian ad litem as well as, I believe, the trial court. And in the hearing for motions, the sanctions, the trial court stated that, you know, we rely on these pleadings. Two judges have now made determinations based on misrepresentations in verified pleadings. Children have been separated. A great deal of expenses have been incurred as a result of all this. And so as far as the motion for sanctions is concerned, it was filed in the guardianship case within the 30-day limit as required by Rule 137. It did deal specifically with the petitions as well as the misrepresentations in the petitions, and it was pointed out during that hearing that Mr. Nowatzki had made one fairly incoherent attempt to correct himself, on the record, in the order of protection hearing, and had thereafter not made, the petitioners have not made any attempt to amend or refile the petition for guardianship at any time throughout the proceedings, either orally or with an amended pleading. There's nothing in the petition for guardianship filed by the Nowatzkis that was inaccurate. The petition for guardianship stated that she had, that Megan was hospitalized and attempted suicide. Suicide, hospitalization again for suicide, multiple attacks. Correct. That's true. That was true. However. The order of protection also said she attempted suicide. That was true. Not on the day that hearing, not on the day that the petition alleged. She did not, in fact, attempt suicide at all on that day. She overdosed on her medication, anti-anxiety medication, fell and hurt herself, and at that point of time Abigail was not there. So not only did she not attempt suicide on that date, she, her daughter was also not present during her. Didn't her parents make the same allegation? On the day that mom says she just took too much medication and fell, they filed their own petition. They filed their own petition for guardianship on the, on their knowledge that Megan was required, had attempted suicide previously, but as far as this particular OP was concerned, with regard to the hearing, that was not relevant because Abigail's petition, or excuse me, the guardians petition was, the only statement that they made in there was about multiple suicide attempts, but none of which had actually been witnessed by them, other than the one that they alleged had happened in front of Abigail, which never actually happened. So the, there was no, there was no basis to their statement in the petition for the order of protection that Abigail was present when Megan attempted suicide, and there was the statement that she had attempted suicide multiple times. They had no foundation for that because they themselves had never been present when that had happened. If I, if you have no further questions. Thank you. Thank you again, Justices. I did want to reply to one issue that is clear from what Ms. Banerjee had discussed with Justices. The orders entered both by the court in the order of protection, Judge Mason, as well as the probate court, Judge Allen, we suggest quite strongly that neither of those orders were entered based on pleadings. Clearly, Mr. Nowatzki corrected the error in the pleading on the order of protection, so it would be inappropriate to suggest that the order of protection was entered based on that false statement within the pleading itself. Again, we believe that was an error and mistake in the pleading that was corrected. As to the guardianship, it is quite clear that the court entered those guardianship orders based on the collective, the collective representations of the entire group of parties. The common allegations by all of the parties regarding a mother's current situation, as well as this existence or nonexistence of the safety plan. And we believe that that's reflected by the court's inquiry, the regular inquiry as to whether or not there's a safety plan. The court did not request any additional information in the subsequent proceedings about how mom was doing. Its sole focus was on whether or not there was a safety plan. There's no pleading that suggests that there was a safety plan in existence. The pleading simply suggests that mom was suicidal. Why do you think, and this is speculation, and it is speculation, but why do you think a trial court would ask if there is a safety plan or want to know the details of a safety plan? What would be the importance of that bit of evidence? Because the jurisdictional basis for a guardianship requires a court to make inquiry whether or not there's a parent ready, willing, and able to make and carry out day-to-day decisions. Judge Allen didn't ask that question about Bob. No, he did not. But the petition filed by your clients did identify Bob. I've got it in front of me. They listed him. I know they made no allegations. Well, they listed him as the father. Correct. To get back to your question, Justice Folgers, if there is a safety plan, what that means is that that parent acknowledged that there was a problem and gave up their right to make those day-to-day decisions involving their minor child. It also would reflect heavily that there may in fact be a basis by which a court would find that a parent was unable to make and carry out day-to-day decisions. So whether a mother or father, if they engaged in a safety plan, it would be at least, again, administratively, but there would be some acknowledgment that they had some impediment to their ability to make decisions regarding their child, and at least in Will County, that's relied on heavily by our probate court. Okay. So that's to go to the findings for guardianship, the necessity for guardianship, is what you're saying? Correct. Okay. Now, in that plan, is there any, based on investigation by DCFS, or agreement of a parent that there would be an individual or individuals that would be suitable to have the child in their care? Are you talking about this case in general? This case in specific or in general in a safety plan? In general. In general, yes. The safety plan always identifies who would be the physical custodian of the child. Which would be of some great importance to a trial judge. Yes. Trying to get information to the best interest of this child. Right. And so that could be useful in trying to make placement, appropriate placement. Thank you. In this case, please keep in mind that the grandparents together went and filed these petitions, Mr. and Mrs. Murphy filing the petition for Bailey and Mr. and Mrs. Nowoski filing the petition for Abigail, and they went as a united front regarding concerns of the DCFS investigation. And, of course, the father, in regards to the one child, has superior rights. Correct. Which is why there was a dismissal. Yes. But why was there a dismissal for both children? Your Honor, to this day I cannot quite figure out the reasoning as to Bailey. Yes. Thank you. Any questions? Okay, then. Thank you. Thank you both for your argument here today. This matter will be taken under advisement and a written decision will be issued to you as soon as possible. And with that, we'll take a short recess for opinion. Thank you.